United States District Court
Southern District of Texas
**ENTERED**
December 08, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ANNETTE BROUSSARD, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-20-1285 |
| | § | |
| EXXONMOBIL GLOBAL SERVICES CO., | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are defendant Exxonmobil Global Services Company's ("Exxon")

motions for summary judgment (Dkt. 14) and to strike portions of the plaintiff's summary

judgment evidence (Dkt. 17).  After reviewing the motions, responses, replies, and applicable law,

the court is of the opinion that the motion to strike should be GRANTED in part and DENIED in

part, and the motion for summary judgment should be GRANTED.

**I. BACKGROUND**

**A.    Broussard's Role at Exxon**

Plaintiff Annette Broussard ("Broussard") began working for Exxon forty years ago, in

1981.  Dkt. 14 at 10.  Thirty-eight years after Broussard joined the company, Exxon fired her.

Broussard filed this suit following her termination, alleging that Exxon discriminated against her

based on her race, sex, and age.

Broussard began her tenure with Exxon as an office assistant but, after graduating college

with a degree in computer science and information technology, she joined the company's

Information Technology department.  *See* Dkt. 14, Exs. 2 at 2, 3 at 2.  Broussard's professional

development history with Exxon reflects training in Lotus database management, Excel macros,

website creation and management, and Dreamweaver, among other database management and website design courses. *Id.*, Ex. 4 at 2. When Exxon terminated her employment, she worked as an "Assistant Systems Technical," a position she acquired in 2010 following an internal reorganization. *Id.* From a ten-thousand-foot view, that position required her to improve the "effectiveness and utility of key existing work processes, tools, and models to maximize the organization's efficiency and productivity," provide "effective technical support," and serve as a site collection administrator for Exxon's many webpages and subsites. *Id.*, Ex. 4 at 2, Ex. 23 at 2.

### B.      Broussard's Interactions with Colleagues

Broussard had three negative interactions with colleagues in 2018, the year preceding her termination. First, an office secretary, Susan Kauffman ("Kauffman"), allegedly yelled at Broussard for using a chair. *Id.*, Ex. 20 at 11. Broussard had taken the chair from a conference room. *Id.* Kauffman, a white female, yelled, "Where are you going with the chair? No, no. You put it back now." *Id.* at 19. Broussard found the exchange "horrendous" and asked Kauffman to "[p]lease stop yelling." *Id.* at 16, 19. Though Broussard could not remember whether Kauffman used any racially charged language, she "recall[ed] tasks being off [her] desk" after she complained about the interaction to her supervisor, Jon Hickman ("Hickman"). *Id.* at 21. Hickman is a white male over forty but younger than Broussard. *Id.*, Ex. 1 at 2. Broussard allegedly raised the incident to Exxon's Human Resources department, as well. *Id.*, Ex. 20 at 21.

Broussard also suffered injuries following a car accident in 2018 that required her to attend physical therapy. *See id.* at 23, Ex. 21 at 3. Broussard stated that Hickman demanded that she drive into work, leave for her appointments, and then return to work following her appointments. *Id.* When Broussard submitted a doctor's note stating that Hickman's proposed schedule would

2

require too much driving, Hickman told her not to come back to work and cut off her computer access so that she could not work from home. *Id.* Broussard further alleges that Hickman treated other employees, including some who were male and younger than her, better. Dkt. 14, Ex. 20 at 72–73, 104. Neither of the employees to whom Hickman displayed favor worked in Exxon's Houston office, though each worked under Hickman. *Id.* at 73, 104.

Evidently, Broussard's relationship with Hickman failed to improve. Broussard alleges that Hickman called her a "poker face" and spoke harshly to her during a "professional meeting." *Id.*, Ex. 20 at 26–26. Broussard thought that "poker face" was a race-based comment, though she admittedly did not "know the meaning of it." *Id.* at 26–27. Irrespective of any racial connotations, Broussard thought it was inappropriate for Hickman to call an older, African American female subordinate a derogatory name. *See id.* at 26.

On August 22, 2019, Broussard reported Hickman's comment to Karen Vieira ("Vieira"), one of the ITRM group's principal managers. *See id.* at 28–29. Vieira is a Hispanic female who is over the age of forty. *Id.*, Ex. 1 at 2. Broussard relayed that she thought that Hickman held a personal grudge against her because she asked "him to speak to [her] in a better manner, or tone." *Id.*, Ex. 26 at 3. Broussard also stated that Hickman "ha[d] been trying to get [her] out of this company since [her] car accident" and requested a "transfer." *Id.* Broussard did not find Vieira to be "responsive" to her concerns. *Id.*, Ex. 20 at 29.

### C. Broussard's Performance Evaluations

As it did with other employees, Exxon annually evaluated Broussard's performance. Dkt. 14, Ex. 1 at 3. An employee's performance is ranked as an "A, B, C, or D" relative to her peers. *Id.* According to Exxon, employee performance evaluations are conducted by a committee

3

of supervisors such that no one individual can assign a single employee a performance grade.  *Id.* ¶ 15.  Broussard received her first "C" ranking in 2010, the year she assumed the role of "Assistant Systems Technical" following Exxon's internal reorganization.  *Id.*  That ranking held steady for three years until, in 2013, Broussard received a "D" ranking.  *Id.*  After her 2013 "D" ranking, Broussard improved her performance to a "C" grade, which she sustained from 2014 through 2018. *Id.*

Broussard's 2017 "C" grade came on the heels of several recognized accomplishments. For instance, Broussard took on a new job responsibility (while maintaining her old ones) that reduced a mailbox backlog averaging 1,000 e-mails per month.  *Id.*, Ex. 9 at 3.  Broussard's performance evaluator, Jamie Manning ("Manning"), commended her for "quickly reducing the backlog in the Asset Safelist mailbox and her facilitation of delivering the new Asset Safelist form," and on "taking the initiative to manage the heavy workload, as well as providing useful ideas on how to simplify [the] workflow process."  *Id.*  Broussard even received an Employee Recognition Award for her work.  Dkt. 16, Ex. 1.  Despite this, Manning "communicated that [Broussard] remained in the C group" and suggested that she could improve her grade by "taking ownership of more complicated issues, and building relationships to deliver more results." Dkt. 14, Ex. 9 at 3.

Broussard's 2018 performance evaluation reflects that she improved on the "taking ownership" front, as she received a commendation for "performing work as asked and independently taking steps to complete work items."  *Id.*, Ex. 10 at 3.  Nevertheless, she still received a "C" grade, with her performance evaluators—Hickman and Manning—identifying Broussard's "softer skills" as an area of concern.  *Id.*  "[I]nteracting with others, communication,

and collaboration skills" were three suggested areas of improvement, and Manning and Hickman also recommended that Broussard complete a "Collaborating in Inclusive Work Environments" course. *Id.* Manning offered in his notes that the two "reinforced during the discussion that ranking is relative and the primary components of that include not only strong work contributions, but also softer skills such as communication and interacting with others." *Id.*

In 2019, Broussard received a "D" grade. *Id.*, Ex. 24 at 3–4. However, unlike prior performance evaluations where Exxon's management identified the employee's strengths and areas needing improvement, Hickman did not note why Broussard received a "D" grade. *See id.* According to Broussard, Hickman was aware of the substantial work she put in to organizing and maintaining ITRM's sites because other Exxon employees would send appreciative e-mails to her with Hickman copied. *See id.*, Ex. 27 at 2. But this recognition was not reflected in her performance evaluation. *See id.*, Ex. 10 at 3.

After Broussard received her "D" grade, she requested a meeting with Human Resources Advisor Sarah Caldwell ("Caldwell") because she thought that the factual basis for her evaluation was inaccurate and incomplete. *See id.*, Ex. 12 at 5. Caldwell informed her that Exxon's law and human resources departments would "work together" to review Broussard's concerns. *Id.* at 3. Broussard also raised her concerns to Vieira in an e-mail. *See id.*, Ex. 26 at 2–3. Broussard relayed that she did "not understand why [Hickman]…elected" to give her a "D" grade after "all the work" she put into getting ITRM's sites organized. *Id.* Broussard also expressed concern that Hickman was retaliating against her because she "advised him to speak to [her] in a better manner, or tone." *Id.* In that vein, Broussard stated that Hickman had "been trying to get [her] out of [Exxon] since [her] car accident." *Id.* So, she asked Vieira whom she could speak to about his behavior. *Id.*

Subsequent e-mail correspondence between Broussard and Vieira, as well as Broussard's notes, revealed vague concerns about the quality of Broussard's work.  *Id.*, Ex. 28 at 2.  Broussard again objected to the factual basis for her receiving a "D" grade, "considering it…enfolded around something that [she] had no control" over: her car accident.  *Id.* at 3.

### D. Broussard is Placed on a Performance Improvement Plan

When employees in office, clerical, or administrative positions, as Broussard was, rank in the "D" category relative to their peers, Exxon places the employee into a Management of Lower Relative Performance ("MLRP") program.  *Id.*, Ex. 1.  The MLRP affords the employee the option to continue her employment with a Performance Improvement Plan ("PIP") or stop working but still receive a salary through outplacement services for a designated number of months.  *Id.* Employees placed into MLRP have twenty-one days to select an option; if they do not select, the program defaults to a PIP.  *Id.*

Following her 2019 "D" grade, Exxon placed Broussard into an MLRP program.  *Id.* Broussard met with Hickman and Vieira, who allegedly told her she "should be thinking about retirement because of [her] age."  Dkt. 14, Ex. 20 at 93.  And because Broussard did not select an option within the twenty-one-day period, Exxon placed her on a PIP in October 2019.  *Id.*, Ex. 1; Dkt. 16, Ex. 1 at 21.  To pass the PIP, Broussard was required to "meet and exceed" the program's objectives.  Dkt. 14, Ex. 23 at 3.  Those expectations included dozens of objectives that ranged from "[c]omplete work to rationalize the number of ITRM sub-sites" to "[c]omplete format updates using the Unity tool or other HTML features for at least 5 ITRM sub-sites" after seeking design approval from Vieira.  *Id.*, Ex. 29 at 4.

6

As these objectives suggest, Vieira assumed the position of Broussard's direct supervisor for the duration of the PIP.  *Id.*, Ex. 20 at 90.  Part of the PIP required Broussard and Vieira to meet weekly to review Broussard's progress.  *Id.*, Ex. 20 at 90.  As was sometimes discussed during those meetings, Vieira did not think that Broussard was making sufficient progress during her PIP.  *Id.*, Ex. 32 at 2–3.  For instance, Vieira advised Broussard that she expected her to exercise "more independent thought" and require less direction to "get to the final product."  *Id.* at 3.  Vieira reiterated some of these complaints to Caldwell.  *Id.*, Ex. 23 at 3.  Ultimately, Caldwell agreed with Vieira's assessment.  *Id.*

Broussard had a different understanding of her progress.  On the one hand, she thought that Vieira did not understand the type of database and site management that Broussard performed.  *Id.*, Ex. 20 at 89.  On the other, Broussard thought she was not at risk of being fired because Vieira represented to her during a meeting in November of 2019 that she was in the "C" category.  *Id.*, Ex 21 at 4.  Broussard also alleges that Vieira verbally advised her at some point prior to her termination that she "was out of danger and risk of losing [her] job."  Dkt. 16, Ex. 1 at 8.  Caldwell allegedly conveyed something similar, telling Broussard that she "was doing well" during the PIP.  *Id.* at 4.

Irrespective of these representations, Broussard also thought that she met—and exceeded—the PIP's performance objectives because, for example, she created several websites, met Vieira's "ever-changing demands," and "worked extended hours."  *Id.* at 8 ¶ 29.  Broussard supplied a spreadsheet featuring more than 200 tasks she purportedly completed while on the PIP.  *Id.* at 44–56.  More than that, Broussard asserts that she responded to Vieira's requests, sometimes within minutes, and completed the tasks Vieira assigned to her on short notice that other colleagues

7

enjoyed more time to complete. *Id.* at 4–5. Finally, to the extent she failed to complete certain assignments within Vieira's requested timeframe, Broussard alleges that she could not perform as "requested because of legal holds or because [she] was waiting on cooperation from other team members." *Id.* at 6.

### E.     Broussard is Fired

On December 11, 2019, Exxon issued Broussard a letter advising her she "caused [her] employment to be terminated due to failure to successfully complete the objectives of the October 2, 2019 to December 2, 2019 Performance Improvement Plan." *Id.*, Ex. 17 at 2. Broussard's effective termination date was December 31, 2019. *Id.* Though Broussard worked for Exxon for thirty-eight years, her termination at the end of 2019 meant that she could only draw sixty percent of her pension. *Id.*, Ex. 21 at 4. She was six months shy of being fully vested. *Id.*

### F.     Procedural background

Broussard filed her first discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on December 16, 2019. She filed a second complaint with the EEOC that also alleged discrimination in violation of Title VII and ADEA on January 14, 2020. *Id.* On April 9, 2020, Broussard commenced the instant action. Dkt. 1. She amended her complaint on September 7, 2020. Dkt. 8. Exxon filed the instant motions for summary judgment (Dkt. 14) on April 23, 2021, and to strike portions of plaintiff's summary judgment evidence on May 21, 2021 (Dkt. 17). Both motions are now before the court.

8

## II. LEGAL STANDARDS

### A.    Admissibility of Evidence at Summary Judgment

The admissibility of evidence "is governed by the same rules, whether at trial or on summary judgment." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 387–88 (5th Cir. 2009) (quoting *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136–37 (5th Cir. 1996)).  Under Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 508 (5th Cir. 2008) (recognizing that evidence based on hearsay or unsupported by personal knowledge is improper summary judgment evidence).  Moreover, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c).

### B.    Summary Judgment

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a

9

genuine issue for trial.  Fed. R. Civ. P. 56(e).  The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

## III. ANALYSIS

### A. Exxon's Motion to Strike

In her response to Exxon's motion for summary judgment, Broussard submitted a declaration detailing her complaints about Hickman and her experience on the PIP.  Dkt. 16, Ex. 1 at 3–9.  Exxon seeks to strike several of Broussard's statements, including:

- <u>Paragraph 1</u>: "I worked for Exxon for thirty-eight (38) years of my life starting in 1981.  Besides the *discrimination, harassment and retaliation* that unfortunately occurred, I still wanted my job and wanted to retire with the company."  Dkts. 16, Ex. 1 at 3 ¶ 1; 17 at 6 (emphasis added).

- <u>Paragraph 3</u>: "When Susan Kauffman yelled at me about moving a chair in a completely disrespectful and derogatory manner in front of my co-workers, I reported her behavior to my supervisor at the time, Jon Hickman.  Unfortunately, nothing was done.  This was in 2018.  I was shocked that Exxon would allow *such discriminatory treatment* and *do nothing* about it."  Dkts. 16, Ex. 1 at 3 ¶ 3; 17 at 6 (emphasis added).

- <u>Paragraph 6</u>: "After I complained about my supervisor Jon Hickman and the derogatory manner in which he spoke to me, my rank was dropped to a "D" in 2019 and then I was told I was being put on a PIP under Karen Vieira.  I had complained to Ms. Vieira about Mr. Hickman's behavior and the name-calling he subjected me to.  Mr. Hickman spoke very harsh to me and I complained about this to Ms. Vieira as well because she was a manager above Mr. Hickman.  I was just going up the ladder to complain about what I found to be *discriminatory treatment*.  Again, nothing was done to address my complaints, and [I was] instead placed on a PIP." Dkts. 16, Ex. 1 at 4 ¶ 6; 17 at 7 (emphasis added).

- <u>Paragraph 22</u>: "In my years of experience working for Exxon, Human Resources escalates employee complaints to 'Law' when they have to do with legal claims of discrimination, retaliation, or harassment (like mine did)."  Dkts. 16, Ex. 1 at 6 ¶ 22; 17 at 3.

10

- <u>Paragraph 24</u>: "I was told that in Exxon, as I got older, I could expect my relative ranking to move downward and this had nothing to do with my performance. This was said to me on several occasions during my performance discussion reviews with my supervisors starting around when I turned 50 years old." Dkts. 16, Ex. 1 at 6 ¶ 24; 17 at 6.

- <u>Paragraph 26</u>: "Exxon asserts that I had, 'no issues with Vieira prior to Vieira becoming [my] supervisor.' However, this is not true because I spoke with Ms. Vieira about Mr. Hickman and nothing was done." Dkts. 16, Ex. 1 at 6 ¶ 24; 17 at 6.

- <u>Paragraph 34</u>: "Exxon's claim that I was not replaced is not true. Before I was terminated, Joice C. Valim took over some of my job duties, such as updating the ITRM website. Attached to this declaration (as Exhibit 1-A) is a true and correct copy of a picture of Ms. Valim and a company announcement. Ms. Valim is outside of my protected class based on race and age." Dkts. 16, Ex. 1 at 9 ¶ 34; 17 at 4.

Exxon complains that these statements are conclusory, based on inadmissible hearsay, improperly contradict sworn deposition testimony, and/or lack personal knowledge. Dkt. 17. Citing to Federal Rule of Civil Procedure 37(c), Exxon relatedly seeks to strike a screenshot taken of Joice C. Valim ("Valim") because it is unauthenticated and was not produced during discovery. Dkt. 17 at 8. *See also* Dkt. 16, Ex. 1 at 11. The court addresses each objection in turn.

### 1. Conclusory and Speculative Statements

Conclusory statements are insufficient to create a triable issue of fact because they do nothing more than recite a legal standard. *Salazar v. Lubbock Cty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020). Like their conclusory brethren, speculative statements do no greater work in showing a genuine issue of material fact. *See Casey v. Livingston Par. Commc'ns Dist.*, No. 07-30990, 2009 WL 577756, at *6 (5th Cir. Mar. 6, 2009) (noting that speculative statements "are not sufficient to defeat" summary judgment); *Everett v. Mississippi*, 106 F. App'x 264, 266 n. 1 (5th Cir. 2004) (noting that speculative statements do "not constitute direct evidence").

11

Exxon complains that some of Broussard's declarations are both conclusory and speculative. Dkt. 17 at 7. In Paragraph 1, Broussard characterizes Exxon's general treatment of her as "discrimination, harassment and retaliation." Dkt. 16, Ex. 1 at 3 ¶ 1. In Paragraph 3, Broussard describes Kauffman's treatment of her as "discriminatory," and observes that Exxon did nothing to respond to it. Dkt. 16, Ex. 1 at 3 ¶ 3.

Broussard's characterization of Exxon's treatment of her as "discrimination, harassment and retaliation" merely "[e]xpress[es] a factual inference without stating the underlying facts on which the inference is based." *See Conclusory*, Black's Law Dictionary (11th ed. 2019). The same is true with respect to her reference to Kauffman's "discriminatory treatment" of her in Paragraph 3 of her declaration.

The court also finds that Broussard's assertion that Exxon did "nothing" in response to Kauffman's treatment is purely speculative. Speculation is a practice of "theorizing about matters over which there is no certain knowledge." *See Speculation*, Black's Law Dictionary (11th ed. 2019). Some speculation might have footing in knowledge because it is based on, at the very least, some factual content. Other speculation is unmoored from any factual considerations and reflects nothing more than an off-the-cuff hypothetical explanation of events. Broussard's speculation falls into the latter category because she fails to identify any evidence, circumstantial or otherwise, in support of her contention that Exxon did "nothing" in response to Kauffman's behavior. Accordingly, the court strikes the above-quoted portions of Paragraphs 1 and 3.

Finally, the court agrees that Broussard's statement in Paragraph 6—that she "found" Exxon's treatment to be "discriminatory"—is conclusory. Accordingly, the court will not consider that statement in Paragraph 6 of her declaration.

### 2. Inadmissible Hearsay

To be considered on summary judgment, materials must be of a type that can be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see also LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016). Just as hearsay is generally inadmissible at trial, so too is it excluded for the purposes of summary judgment. *See Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) ("[O]n a motion for summary judgment, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial.").

Exxon argues that Paragraph 24 of Broussard's declaration contains inadmissible hearsay. Dkt. 17 at 6. In that paragraph, Broussard states that she "was told" that her "relative ranking" would be downwardly adjusted irrespective of her performance." Dkt. 16, Ex. 1 at 6 ¶ 2. She further offers that "[t]his was said to me on several occasions during my performance discussion reviews with my supervisors starting around when I turned 50 years old." Dkt. 16, Ex. 1 at 6 ¶ 24. Broussard argues that the statement "is not a hearsay statement" because it "is based on the personal knowledge of what she was told directly while employed by [Exxon]" and, in any event, is an opposing party statement. Dkt. 19 at 6.

Broussard's suggestion that a statement cannot be hearsay if it is "based on personal knowledge" incorrectly frames the issue before the court. *Id.* at 6. The Federal Rules of Evidence instruct that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Those same rules define hearsay as a "statement that the declarant does not make while testifying at the current trial or hearing…and…[that] a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(1)–(2). Taken together, "[t]he personal

knowledge requirement and the hearsay rule are cut at least in part from the same cloth, as Rule 602 prevents a witness from testifying about a hearsay statement upon which [s]he has no personal knowledge." *United States v. El-Mezain*, 664 F.3d 467, 495 (5th Cir. 2011), *as revised* (Dec. 27, 2011) (internal quotations omitted).  For that reason, "a witness may not merely repeat the subject matter of a hearsay statement, nor may [s]he rely on inadmissible hearsay as a substitute for her own knowledge." *Id.*  Broussard does not have direct, personal knowledge that Exxon downgrades its employees as they age, irrespective of their actual relative performance.  To the extent she has knowledge of this alleged practice, her declaration suggests it is based on what unidentified other people have told her.  *See* Dkt. 16, Ex. 1 at 6 ¶ 24.  Accordingly, Broussard cannot circumvent consideration as to whether the challenged statements are inadmissible hearsay or party-opponent admissions.

On that issue, the court concludes that the challenged statements do not qualify as party-opponent admissions and, because they are offered for the truth of the matter asserted, qualify as inadmissible hearsay.  For a statement to qualify as an opposing party statement, it must (1) be offered against an opposing party; (2) be made by the party in an individual or representative capacity; (3) be one that the party manifested that it adopted or believed to be true; (4) be made by a person from whom the party authorized to make a statement on the subject; (5) be made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or (6) be made by the party's co-conspirator during and in furtherance of the conspiracy.  Fed. R. Evid. 801(d)(2)(A)–(E).  Where, as here, the declarant of a statement is unidentified, courts consider whether the statement's proponent has "presented…sufficient evidence [for the court to] conclude that the person who is alleged to have made the damaging statement is in fact a party or

14

an agent of that party for purposes of making an admission within the context of Rule 801(d)(2)."
*Davis v. Mobil Oil Expl. & Producing Se., Inc.*, 864 F.2d 1171, 1174 (5th Cir. 1989)*; see also El-Mezain*, 664 F.3d at 505 (holding that anonymous statements may be admissible under Rule 801(d)(2)(E)); *Cleveland v. Ford*, 12 F.3d 209 (5th Cir. 1993) (per curiam) (holding that unidentified remarks failed to qualify as admissions by a party opponent under Rule 801(d)(2) "[a]bsent some indication of who made the remarks").

The Fifth Circuit's decisions in *Davis* and *Cleveland* are illustrative of the indicia of reliability necessary for circumstantial evidence to establish an agency relationship where the declarant is unidentified.[1]  In *Davis*, the plaintiff and his co-workers testified that an unidentified Mobil company supervisor instructed other employees not to wash off a drill floor, which was apparently an unsafe practice.  864 F.2d at 1173.  Plaintiff explained that the statement's unidentified declarant donned a company hard hat while making the statement during an operations safety meeting attended by other employees.  *Id.* at 1174.  Two co-workers testified to the same effect.  *Id.*  Mobil argued that the unidentified declarant's statement did not fall within the purview of Rule 801(d)(2)(D) because the proponents could not identify the man by name.  *Id.* at 1173–74.

---

[1]     Other courts also recognize that circumstantial evidence by establishing an agency relationship under Rule 801(d)(2) even where the declarant is unidentified.  In *Pappas v. Middle Earth Condominium Association*, the Second Circuit reversed a district court that excluded a party-opponent admission where the plaintiff established that the declarant responded to a telephone complaint about ice on a sidewalk with ice removal tools and a property management company declared that one of two employees would be responsible for snow and ice removal.  963 F.2d 534, 538 (2d Cir. 1992).  The Second Circuit held that this circumstantial evidence was sufficient to establish an agency relationship.  *Id.*  More recently, the Sixth Circuit held that a plaintiff established an agency relationship between unidentified declarants and defendant hospitals where the speakers were indisputably "executives" or "stakeholders" of the hospitals.  *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 944 (6th Cir. 2016).

15

The Fifth Circuit disagreed, reasoning that the evidence was "sufficient…to permit the testimony as an admission against Mobil." *Id.* By contrast, in *Cleveland*, the plaintiff in an ADEA action cited remarks allegedly made by managers during a meeting about older workers. 12 F.3d at *2. The plaintiff offered no other evidence beyond this, and the Fifth Circuit held that there was an insufficient evidentiary basis for the statements to qualify as party-opponent admissions. *Id.*

Broussard's foundation for establishing an agency relationship is weaker than that in *Cleveland*. The plaintiff in Cleveland affirmatively alleged that his managers made the statements. *See id.* But Broussard stops short of alleging that her supervisors told her she "could expect [her] relative ranking to move downward" irrespective of anything "to do with [her] performance." Dkt. 16, Ex. 1 at 6 ¶ 24. Instead, using the passive voice, she avers that these comments were "said to [her] on several occasions during [her] performance discussion reviews with [her] supervisors." *Id.* The passive voice implies, but does not state, who made the statements. Thus, Broussard's argument to establish an agency relationship for Rule 801(d)(2) rests upon the implication that unidentified supervisors made the comments. But that is an implication this court is unwilling to rely upon absent further identifying evidence that is at least on par with that provided in *Davis*. Even if the court were to accept the implication—that the unidentified supervisors affirmatively told Broussard that her relative ranking would suffer as she aged irrespective of the quality of her performance—she would be in no better a position than the *Cleveland* plaintiff. The court thus concludes that the statements do not qualify as party-opponent statements. Instead, the court concludes that the statements are inadmissible hearsay because commentary as to Exxon's allegedly discriminatory evaluation practices is relevant only insofar as it is offered for the truth

of the matter asserted.  *See* Fed. R. Evid. 801(c)(1)–(2).  The court, therefore, strikes Paragraph 24 of Broussard's declaration.  *See* Dkt. 16, Ex. 1 at 6 ¶ 24.

### 3.   Contradicted Deposition Testimony

Exxon argues that the information contained in Paragraph 26 of Broussard's declaration contradicts her prior deposition testimony without explanation and should be struck.  Dkt. 17 at 7–8.  The court disagrees that there is an obvious contradiction.

In her declaration, Broussard states: "Exxon asserts that I had, 'no issues with Vieira prior to Vieira becoming [my] supervisor.'  However, this is not true because I spoke with Ms. Vieira about Mr. Hickman and nothing was done."  Dkt. 16, Ex. 1 at 6 ¶ 26.  But during her September 29th deposition, Broussard testified as follows:

> **Q:**   When you went to—before September of 2019 when she became your supervisor, did you have any issue with Karen Vieira?
> **A:**   No.
> **Q:**   You don't —
> **A:**   I don't believe I really spoken to her.  I think maybe we talked about work, and I recall trying to explain to her how websites work and how she is supposed to send the documentation.
> **Q:**   But you had no complaints about her before the time period when she became your supervisor?  Is that correct?
> **A:**   I didn't interact with her.

Dkt. 17, Ex. 1 at 4.  Broussard responds by arguing that her declaration is consistent with her March 23rd deposition testimony:

> **Q:**   You previously stated that you complained to Karen Vieira.  When did you complain to Karen Vieira?
> **A:**   Probably the same year.
> **Q:**   2018?
> **A:**   Yes.
> **Q:**   Ms. Vieira became your supervisor in September of 2019.  Correct?
> **A:**   Correct.
> **Q:**   Did you have much interaction with her before September of 2019?
> **A:**   No, just in working and passing, no, not really.

**Q:**   Did you work with her much before September 2019?
**A:**   No.  That's what I was just saying, no.

[…]

**Q:**   Did you have any issue with her before September of 2019?
**A:**   I reported Jon to her for calling me—for the name-calling.  I told her about that in 2018.

[…]

**Q:**   And how did Karen Vieira respond to your complaint about Jon Hickman allegedly calling you "poker face"?
**A:**   We said some other things.  I don't remember; but, I guess, if I can say kind of not responsive.  I don't know how to say it.

Dkt. 14, Ex. 20 at 24–29.  The court finds that Paragraph 26 of Broussard's declaration is consistent with her March 23rd deposition testimony.  *Compare* Dkt 16, Ex. 1 at 6 ¶ 26, *with* Dkt. 14, Ex. 20 at 24–29.  To the extent that the declaration's content is inconsistent with Broussard's September 29th deposition testimony, the contradiction is not entirely clear.  That is because the word "issue" is ambiguous: its meaning can encompass objections to behavior compelling the filing of formal complaints as much as grievances that an individual quietly harbors within herself.  Broussard's March 23rd deposition testimony suggests she had an issue—in the sense that she was dissatisfied—with Vieira's response to her complaint about Hickman.  *See* Dkt. 14, Ex. 20 at 24–29.  But Broussard might have had a different understanding of the word "issue" when Exxon asked her the same question several months later.  In any event, "[e]ven a party's testimony in the same proceeding does not conclusively bar h[er] later allegations to the contrary."  *Copeland v. Wasserstein, Perella & Co.*, 278 F.3d 472, 481 (5th Cir. 2002).  So, Exxon's motion to strike is denied with respect to Paragraph 26.

18

### 4.   The Unauthenticated, Previously Unproduced Screenshot

In her response to Exxon's motion for summary judgment, Broussard included a screenshot allegedly portraying Valim, one of the Exxon employees who allegedly assumed Broussard's responsibilities following her termination.  *See* Dkt. 16, Ex 1 at 11.  Exxon asks the court to strike the screenshot, arguing that it is unauthenticated and that Broussard did not produce it during discovery.  Dkt. 17.

Rule 901 provides that, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  This is "not a heavy burden, and circumstantial evidence or testimony by a knowledgeable witness can be sufficient."  *Thompson v. Bank of Am. Nat. Ass'n*, 783 F.3d 1022, 1027 (5th Cir. 2015).  When an exhibit purports to represent an electronic source, "testimony by a witness with direct knowledge of the source, stating that the exhibit fairly and fully reproduces it, may be enough to authenticate it."  *Id.*  This requirement is in keeping with Rule 56, which instructs that declarations "used to support or oppose a motion [for summary judgment] must be made on personal knowledge."  Fed. R. Civ. P. 56(c)(4).

Broussard fails to meet this standard.  Broussard argues that she authenticated the screenshot when she declared that it was "a true and correct copy of a picture of Ms. Valim and a company announcement."  Dkt. 19 at 7.  However, at no point does Broussard explain how she has personal knowledge that the screenshots are an accurate depiction of Valim.  *See Thompson*, 783 F.3d at 1027 (holding at summary judgment that witness affidavits did not authenticate an online log because the affidavits did not "say that [the witnesses] have personal knowledge of the

19

online log or that it represents an unaltered version of the website…likely because…th[e] log[ ] w[as] created and maintained by" a third party rather than by the witnesses).

In addition, Exxon argues that the court should strike the screenshot because Broussard failed to disclose it during discovery in violation of Rule 37.  Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1). Broussard claims that the failure to disclose was harmless and argues that "Exxon would suffer no prejudice if th[e] document" was used to show Valim's position and that she was outside of Broussard's protected class.  Dkt. 19 at 7–8.  At this juncture, the court need not decide whether the failure to disclose the screenshot was harmless because it strikes it for being unauthenticated.

### B.  Exxon's Motion for Summary Judgment

In support of its motion for summary judgment, Exxon argues that most of the alleged discriminatory or retaliatory acts identified by Broussard are time-barred.  Dkt. 14 at 22.  Exxon also argues that Broussard fails to establish that she suffered an adverse employment action and was replaced by someone outside her protected class.  *Id.* at 23–24.  The court agrees that some of Broussard's claims are time-barred.  In addition, the court concludes that Broussard has failed to state a *prima facie* case of discrimination because she cannot show that she was replaced by someone outside of her protected class.

### 1.  Timeliness of Claims

Title VII and the ADEA protect employees from race, sex, and age discrimination. However, various time limitations determine whether claims of discrimination are actionable.

20

Both statutes, in relevant part, require plaintiffs to bring their discrimination charges within 300 days of the allegedly unlawful practice's occurrence. *See* 42 U.S.C.A. § 2000e-5; 29 U.S.C. § 626(d)(1)(B). "[O]nly incidents that took place within the timely filing period are actionable." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061 (2002).

Broussard filed her first discrimination charge with the EEOC on December 16, 2019. Broussard complains of the following conduct that occurred before February 19, 2019:

- A 2018 interaction with Kauffman during which Kauffman yelled at Broussard for take a chair out of a conference room. Dkt. 14, Ex. 20 at 11.

- In 2018, when Hickman cut off access to her work computer following her car accident. Dkt. 14, Ex. 20 at 21.

- In 2018, when Hickman allegedly treated Broussard's colleagues with greater respect than he conveyed to her. Dkt. 14, Ex. 20 at 72, 104.

- In 2018, when Hickman called Broussard a "poker face." Dkt. 14, Ex. 20 at 25.

Therefore, insofar as Broussard claims that these instances represent discrete instances of discrimination, she is time-barred from raising them here.

### 2. Broussard Fails to Establish a Prima Facie Case of Discrimination

Broussard fails to establish a *prima facie* case of discrimination under both Title VII and ADEA. The Fifth Circuit recognizes that plaintiffs alleging intentional discrimination may advance their claims using circumstantial evidence. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). When circumstantial evidence is presented, the well-known *McDonnell Douglas* burden-shifting framework applies. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973)). Courts apply the *McDonnell Douglas* framework in contexts

of race, sex, and age discrimination.  *Id.* at 556–57; *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 388–89 (5th Cir. 2020); *see also* 29 U.S.C. § 621, *et seq.*

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination, which requires a showing that she "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy*, 492 F.3d at 556.  "If the plaintiff makes a *prima facie* showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory…reason for its employment action."  *Id.* at 557.  The Fifth Circuit has clarified that "[t]he employer's burden is only one of production, not persuasion, and involves no credibility assessment."  *Id.*  If the employer meets its burden of production, the burden shifts back to the plaintiff to prove that the employer's proffered reason is not true but instead is a pretext for the real discriminatory purpose.  *Id.*  "To carry this burden, the plaintiff must rebut each nondiscriminatory…reason articulated by the employer," *id.*, using "substantial evidence."  *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  Exxon contends that Broussard fails to meet the third and fourth elements of the *McDonnell Douglas* framework—that she did not suffer an adverse employment action and was not replaced by someone outside her protected class.[2]  Dkt. 14 at 23–24.  The court addresses each issue in turn.

---

[2]     Even if Exxon had not conceded the first two elements, the court would have found them met.  Broussard is an African American female who was 59 years old when Exxon terminated her employment. Dkt. 16 at 13.  Her degrees in computer science and information technology, coupled with her extensive training history, made her qualified to work as an Assistant Systems Technical.

Though it acknowledges that Broussard's discharge is "potentially actionable," Exxon devotes nearly three pages of briefing to argue that the remainder of "Broussard's allegations do not amount to adverse employment actions." *Id.* at 24–26.  As Exxon observes, the case law is clear: an adverse employment action is an "ultimate employment decision, such as hiring, granting leave, discharging, promoting, or compensating." *McCoy*, 492 F.3d at 559.  Broussard unequivocally suffered an adverse employment action when Exxon discharged her from her position.  There is no genuine dispute of material fact on this element of the *McDonnell Douglas* framework.

Turning to whether Broussard demonstrated that she was "replaced" by someone outside of her protected class after the company redistributed her duties across a team is a harder question that the Fifth Circuit has not consistently answered.  A few cases offer conflicting directions.  In *Williams v. Trader Publishing Company*, the Fifth Circuit concluded that a plaintiff's failure to "prove that she was replaced by a member of a non-protected class" did not defeat "the establishment of a *prima facie* case under Title VII."  218 F.3d 481, 485 (5th Cir. 2000) (per curiam).  Indeed, ten days prior to deciding *Williams*, in *Young v. Harris Health Care, Inc.*, the Fifth Circuit determined that a plaintiff had established a *prima facie* case of age discrimination even where her position was restructured within a company and her responsibilities absorbed by younger employees following her discharge.  No. 99-30186, 2000 WL 1029180, at *3 (5th Cir. July 14, 2000) (unpublished).

Though the *Williams* Court characterized its understanding of replacement prong's non-necessity as "well settled," *id.*, the Fifth Circuit has since consistently framed satisfaction of *McDonnell Douglas*' fourth element as an essential condition to stating a *prima facie* case.  *See,*

*e.g.*, *Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020) (noting that, to state a *prima facie* case of intentional discrimination under Title VII, plaintiff "must demonstrate" that she "was replaced by someone outside her protected group"); *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 268 (5th Cir. 2015) (noting that a plaintiff "must…establish…that…he was replaced by someone outside the protected class").  *But see Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995) (noting that plaintiffs may satisfy the replacement prong by showing that their discharge was based on a protected trait even when they were not replaced in the context of a company-wide reduction in force).  And, more recently, the Fifth Circuit announced that "[a]n employee has not been replaced when his former duties are distributed among other co-workers." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) (quoting *Griffin v. Kennard Indep. Sch. Dist.*, 567 F. App'x 293, 294–95 (5th Cir. 2014) (per curiam)) (internal quotations omitted).  That pronouncement merits serious consideration, given that the *Ernst* plaintiff, like Broussard, lost his position following a stand-alone discharge.  *See id.*

If satisfaction of the replacement prong were unnecessary, as the *Williams* court suggested, the court could find that Broussard established a *prima facie* case and proceed with a pretext analysis.  Alternatively, if (1) analyzing whether Exxon effectively replaced Broussard is necessary, as the court suspects, and (2) showing a redistribution of duties to employees outside the protected class fulfills this element, the court would conclude that Broussard establishes a *prima facie* case of race discrimination: Broussard shows competent evidence that Exxon

redistributed her duties across the ITRM team in which, at the time of her discharge, she was the only African American.[3]  *See* Dkt. 14 at 26; Dkt. 16, Ex. 1 at 9, 112

Notably, these facts echo those in *Young*.  *See* 2000 WL 1029180, at *3.  But *Young* is not binding, and the redistribution rule announced in *Ernst*, a published case, significantly diminished its persuasive authority.[4]  Of course, the *Ernst* Court's pronouncement is arguably dictum in the sense that "it could have been deleted without seriously impairing the analytical foundations of the

---

[3]    Broussard cannot state a *prima facie* case of sex or age discrimination because she fails to identify facts within the universe of competent summary judgment evidence before the court showing that Exxon redistributed her duties exclusively to male employees or younger employees, respectively.

[4]    The court notes a growing division between the courts of appeal on the issue of whether a company's redistribution of a terminated employee's duties to members outside her protected class constitutes a "replacement" under the *McDonnell Douglas* framework.  *Compare Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 59 (1st Cir. 2005) (finding that plaintiff satisfied the replacement element where she showed that the employer had a continuing need of her job duties and that an employee outside her protected class absorbed said duties following her termination), *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1169 (10th Cir. 2003) (explaining that the redistribution rule makes sense in the context of a reduction in force measure where, to show pretext, plaintiffs must generally show that "in fact, [their] job[s] w[ere] not eliminated"), *and Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000) (determining that "because the fired employee's duties were absorbed by others, they were effectively 'replaced,' not eliminated."), *with Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (holding that, "in the context of a work force reduction…[a] person is not considered replaced when his duties are absorbed by another person or when the work is redistributed among other existing employees already performing related work") (internal quotations omitted).  As these cases suggest, the redistribution defense emerged in the context of massive layoffs that often entailed the re-assignment of a terminated position's job duties to the retained workers.  The *Ernst* Court's articulation of the redistribution rule arose not in the context of a company-wide reduction in force but from a stand-alone termination.  1 F. 4th at 336–37.  Where an employee is discharged for discriminatory reasons, the redistribution rule appears to do little to advance *McDonnell Douglas*' replacement requirement, which "serves to weed out claims of discriminatory termination where the plaintiff was discharged simply because his job was being eliminated."  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 854 (D.C. Cir. 2006).  It also affords employees who were discharged for discriminatory reasons no recourse under Title VII so long as employers ensure that responsibilities are dispersed amongst existing personnel.

holding." *See United States v. Segura*, 747 F.3d 323, 328–29 (5th Cir. 2014).   Though it is

axiomatic that dictum is not binding, courts nevertheless recognize that it is highly persuasive. *See*

*Knight v. Kirby Offshore Marine Pac., L.L.C.*, 983 F.3d 172, 179 (5th Cir. 2020).  For this reason,

the court concludes that Broussard has failed to establish a *prima facie* case of discrimination.

Because the strength of a plaintiff's *prima facie* case "remains relevant to pretext" and will "factor

into whether [an] employer is entitled to judgment as a matter of law," the court ends its analysis

here.  *See E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 244 (5th Cir. 2016).

## IV. CONCLUSION

Therefore, it is ordered that Exxon's motion to strike (Dkt. 17) is GRANTED IN PART

and DENIED IN PART and its motion for summary judgment (Dkt. 14) is GRANTED.

Signed at Houston, Texas on December 8, 2021.

_____
Gray H. Miller
Senior United States District Judge

26